**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 10-cv-03177-REB-KMT

THE ESTATE OF STEVEN WAYNE BLECK, by Joanna Churchill, Personal Representative for Steven Bleck, deceased,

    Plaintiff,

vs.

CITY OF ALAMOSA, COLORADO,

    Defendant.

---

## ORDER

**Blackburn, J.**

This matter is before me on remand from the Tenth Circuit for further consideration of the arguments raised originally in (1) **Defendants' Motion for Judgment on the Pleadings and for Summary Judgment** [#38],[1] filed August 15, 2011; and (2) **Plaintiff's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56** [#130], filed January 20, 2012. The parties have submitted supplemental briefs on the issues implicated by the Tenth Circuit's remand order [##226 & 227]. Having considered the Tenth Circuit's opinion, the arguments raised and authorities cited in the original and supplemental briefs, and all relevant evidence submitted in connection therewith, I find and conclude that defendant is entitled to judgment as to plaintiff's sole remaining claim for failure to train.

---

[1] "[#38]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

## I. JURISDICTION

I have jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question).

## II. STANDARD OF REVIEW

Both plaintiff and defendant have moved for summary judgment.[2] Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. **FED. R. CIV. P**. 56(c); ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. ***Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); ***Farthing v. City of Shawnee***, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); ***Farthing***, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. ***Concrete Works, Inc. v. City & County of Denver***, 36 F.3d 1513, 1517 (10th Cir. 1994), ***cert. denied***, 115 S.Ct. 1315 (1995). By contrast, a movant who bears the burden of proof must submit evidence to establish every essential element of its claim or affirmative defense. ***See In re Ribozyme Pharmaceuticals, Inc.***

---

[2] The mere fact that the parties have filed cross-motions for summary judgment does not necessarily indicate that summary judgment is proper for either party. ***See Atlantic Richfield Co. v. Farm Credit Bank of Wichita***, 226 F.3d 1138, 1148 (10th Cir. 2000); ***James Barlow Family Ltd. Partnership v. David M. Munson, Inc.***, 132 F.3d 1316, 1319 (10th Cir. 1997). ***See also Buell Cabinet Co. v. Sudduth***, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

***Securities Litigation***, 209 F.Supp.2d 1106, 1111 (D. Colo. 2002).  In either case, once the motion has been supported properly, the burden shifts to the nonmovant to show by tendering depositions, affidavits, and other competent evidence that summary judgment is not proper.  ***Concrete Works***, 36 F.3d at 1518.  All the evidence must be viewed in the light most favorable to the party opposing the motion.  ***Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services***, 165 F.3d 1321, 1326 (10th Cir.), ***cert. denied***, 120 S.Ct. 53 (1999).  However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence.  ***Rice v. United States***, 166 F.3d 1088, 1092 (10th Cir.), ***cert. denied***, 120 S.Ct. 334 (1999); ***Nutting v. RAM Southwest, Inc.***, 106 F.Supp.2d 1121, 1123 (D. Colo. 2000).

### III.  ANALYSIS

The facts of this case are well known to the parties and recited at length both in this court's prior order, ***see Bleck v. City of Alamosa***, 839 F.Supp.2d 1149, 1151-52 (D. Colo. 2012), and the opinion of the Tenth Circuit on appeal, ***Estate of Bleck ex rel. Churchill v. City of Alamosa, Colorado***, 540 Fed. Appx. 866, 867-868 (10th Cir. Nov. 4, 2013).  They therefore need not be repeated here, except in the context of addressing the issues that remain for determination following remand.

The Tenth Circuit concluded, contrary to this court's decision, that plaintiff, Steven Bleck,[3] was seized when Officer Martinez attempted to push Mr. Bleck down on

---

[3] Although Mr. Bleck died while this case was pending on appeal, and the personal representative of his estate was substituted as the appellant, ***see Estate of Bleck***, 540 Fed. Appx. at 866 n.*, for convenience I nevertheless continue to refer herein to Mr. Bleck himself as the plaintiff.  In addition, although it appears that there was some suggestion at the appellate level that the substitution

3

the bed by going "hands on" without first reholstering his duty weapon.  Although Officer Martinez was found to have qualified immunity as to Mr. Bleck's claims against him, the case was remanded to consider Mr. Bleck's claim for failure to train against the City of Alamosa, which enjoys no such immunity from suit.  **See Starkey ex rel. A.B. v. Boulder County Social Services**, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009).  To prove this claim, Mr. Bleck must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." **Estate of Bleck**, 540 Fed. Appx. at 874 (citation and internal quotation marks omitted).  Because I conclude that Mr. Bleck can satisfy neither of these elements, the City is entitled to judgment.

As to the first element, the question whether Officer Martinez committed a constitutional violation is only partially answered by the Tenth Circuit's determination that Mr. Bleck was seized when "Officer Martinez intentionally accomplished the termination of [his] freedom of movement through the tandem action of the hands-on technique and the display of his gun."  *Id.* at 876.  As the Tenth Circuit noted, "[t]hat does not end the constitutional analysis, however.  Then, the pivotal question becomes whether the seizure was reasonable."  *Id.*  (citation and internal quotation marks omitted).  **See also Brower v. County of Inyo**, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382-83, 103 L.Ed.2d 628 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'").

---

affected the scope of relief available, *see id.*, any such issues have not been presented to me for consideration and resolution.

"Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment." ***Medina v. Cram***, 252 F.3d 1124, 1131 (10th Cir. 2001). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." ***Graham v. Connor***, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (citation and internal quotation marks omitted). The ultimate question is "whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." ***Estate of Larsen ex rel. Sturdivan v. Murr***, 511 F.3d 1255, 1260 (10th Cir. 2008). This fact-intensive inquiry is informed by a number of non-exclusive factors, including:

> (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

***Id. See also Graham***, 109 S.Ct. at 1872 (relevant factors "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). In assessing these and all other relevant considerations, the court must bear always in mind that "'because police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be

judged from that on-scene perspective." **Estate of Larsen**, 511 F.3d at 1259-60 (quoting **Saucier v. Katz**, 533 U.S. 194, 205, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001)). **See also Graham**, 109 S.Ct. at 1872 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Mr. Bleck argues that it was not objectively reasonable for Officer Martinez to employ deadly force in connection with his seizure. This argument misses the mark, however, because there is no evidence to suggest that Officer Martinez's firing of the weapon was anything other than accidental. A violation of the Fourth Amendment presupposes intentional conduct – mere negligence is insufficient to make out a viable constitutional claim. **See Sevier v. City of Lawrence, Kansas**, 60 F.3d 695, 699 n.7 (10th Cir. 1995). **See also Scott v. Harris**, 550 U.S. 372, 384 n.10, 127 S.Ct. 1769, 1778 n.10, 167 L.Ed.2d 686 (2007) (noting that "[c]ulpability *is* relevant, however, to the *reasonableness* of the seizure") (emphases in original). Thus, the proper focus is not on the shooting itself, but rather on whether it was objectively unreasonable for Officer Martinez to enter the room with his weapon drawn and/or to fail to reholster his gun prior to going hands on. **See Watson v. Bryant**, 532 Fed. Appx. 453, 457-58 (5th Cir. Feb. 4, 2013); **McCoy v. City of Monticelllo**, 342 F.3d 842, 848-49 (8th Cir. 2003); **Tallman v. Elizabethtown Police Department**, 167 Fed. Appx. 459, 464 (6th Cir. Jan. 23, 2006) **Pleasant v. Zamieski**, 895 F.2d 272, 276 (6th Cir.), **cert. denied**, 111 S.Ct. 144 (1990); **Stamps v. Town of Framingham**, 38 F.Supp.3d 146, 153-54 (D. Mass. 2014); **Speight v. Griggs**, 13 F.Supp.3d 1298, 1321-22 (N.D. Ga. 2013), **vacated in part on other**

***grounds***, 579 Fed. Appx. 757 (11th Cir. Sept. 2, 2014).

I have little difficulty in concluding that Officer Martinez's decision to enter the room with his gun drawn was objectively reasonable. In analyzing this issue, the court must consider whether the surrounding circumstances suggest that the officer reasonably could have feared an immediate threat to his personal safety or the safety of others. ***Estate of Larsen***, 511 F.3d at 1260. Although officers were called to Mr. Bleck's hotel room on a welfare check, the information available to them was that Mr. Bleck had been drinking and that he was armed and had threatened to "blow his head off." Whether these facts ultimately were borne out is irrelevant. ***See Graham***, 109 S.Ct. at 1872. The court must account for "the practical difficulties of attempting to assess the suspect's dangerousness," ***Tennessee v. Garner***, 471 U.S. 1, 20, 105 S.Ct. 1694, 1705. 85 L.Ed.2d 1 (1985), and remember that "[a] reasonable officer need not await the glint of steel before taking self-protective action," ***Estate of Larsen***, 511 F.3d at 1260 (citation and internal quotation marks omitted). From that perspective, it was not objectively unreasonable for Officer Martinez to enter the room with his duty weapon drawn.[4]

Although it is a closer question whether the failure to reholster the gun before going hands on was reasonable, ultimately I find that no reasonable jury could conclude otherwise. On the one hand, Mr. Bleck was not suspected of criminal activity and he

---

[4] Mr. Bleck's expert opines that the officers on the scene "had no information that Steven Bleck was a threat to, or had made a threat to, anyone other than himself." (**Plf. Motion App.**, Aff. of Daniel Montgomery ¶ 22 at 5 [#47-2], filed September 15, 2011.) This is a far cry from suggesting that it was unreasonable for Officer Martinez to have his duty weapon drawn as he entered the room, and the model standards to which Mr. Montgomery refers prescribe no such condition either. The fact that officers reasonably believed that Mr. Bleck was armed justified them in having their weapons at the ready as they entered the room, pending further clarification of Mr. Bleck's intentions.

7

had not overtly or explicitly threatened the officers. Nevertheless, Officer Martinez's undisputed testimony is that, because Mr. Bleck's back was to the door as officers entered the room, he could not see Mr. Bleck's hands, and Mr. Bleck did not respond to an order to show his hands. Nor did Mr. Bleck respond to the officer's directive to lie on the floor, but instead may have attempted to stand, prompting Officer Martinez's decision to go hands on in an attempt to bring him under control.

The fact that Officer Martinez violated department policy in so doing without first reholstering his duty weapon is not dispositive. "It is irrelevant that [the officer] may have neglected to follow best practices by attempting to handcuff a suspect while holding a gun, however tragic the result. The failure to use 'proper procedure' does not prove excessive force." **Watson v. Bryant**, 532 Fed. Appx. at 458. **See also Smith v. Freland**, 954 F.2d 343, 347 (6th Cir.) ("Under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force."), **cert. denied**, 112 S.Ct. 1954 (1992). Instead, the relevant question is whether any such failure to follow the procedure is itself of constitutional dimension, and that question ultimately returns to a determination whether the officer's actions were reasonable in light of the situation in which he found himself and the totality of the circumstances he faced.

Those circumstances included that Mr. Bleck was suicidal, intoxicated, and most relevantly, armed. In addition, although not manifestly aggressive, Mr. Bleck had not unequivocally surrendered and had failed to follow commands which would have clarified whether he was armed. **See Watson**, 532 Fed. Appx. at 458; **Tallman**, 167

Fed. Appx. at 466; **Reese v. Anderson**, 926 F.2d 494, 501 (5th Cir. 1991); **Pleasant**, 895 F.2d at 276. **Cf. Walker v. City of Orem**, 451 F.3d 1139, 1160 (10th Cir. 2006) (use of deadly force not reasonable where, *inter alia*, officer should have been able to see that suspect was unarmed, and suspect was not resisting arrest); **Stamps**, 38 F.Supp.3d at 153 (use of force not reasonable where, *inter alia*, suspect cooperated with police commands and officers had been specifically advised that suspect posed no threat to their safety); **Johnson v. City of Milwaukee**, 41 F.Supp.2d 917, 924-26 (E.D. Wis. 1999) (genuine dispute of material fact as to reasonableness of officer's actions existed where suspect had surrendered). Based on these circumstances, Officer Martinez was not required to "await the glint of steel" before his decision to go hands on could be considered reasonable. **Estate of Larsen**, 511 F.3d at 1260 (citation and internal quotation marks omitted).

Of course, his decision to do so prior to reholstering his weapon admittedly was ill-advised at best. Yet the court also is mindful that these actions all occurred within a span of mere seconds, in cramped quarters, and in a tense and uncertain atmosphere. Officer Martinez's own safety – not to mention that of the other officers, other persons in the vicinity, or indeed, Mr. Bleck himself – might have been jeopardized had he taken the time to reholster his gun before reacting to Mr. Bleck's perceived intransigence. **See Pleasant**, 895 F.2d at 276-77 (although officer should have been aware that fleeing suspect did not pose a threat, he "had little time to react" and "[h]ad he taken the time to put his gun away, [the suspect] would have escaped"). Regardless whether Mr. Bleck was only passively resisting – or indeed, simply had not heard the command – "no right

is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." ***Young v. City of Killeen, Texas***, 775 F.2d 1349, 1353 (5th Cir. 1985). Any mistake by Officer Martinez in reading the situation, while regrettable, was not objectively unreasonable given the circumstances then confronting him.

Nevertheless, even if I were to find that genuine disputes of material fact existed as to the objective reasonableness of Officer Martinez's conduct, Mr. Bleck has failed to establish the other remaining element of his section 1983 claim – that a municipal policy or custom was the moving force behind the constitutional deprivation.

Mr. Bleck alleges that the City was deliberately indifferent for allegedly failing to train officers in procedures for dealing with mentally ill and/or suicidal suspects.

> In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a Plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:
>
> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

***Carr v. Castle***, 337 F.3d 1221, 1228 (10th Cir. 2003) (citation and internal quotation marks omitted). However, Mr. Bleck has failed to offer evidence sufficient to create a genuine dispute of material fact as to the adequacy of the training officers received, nor has he established same on the issues of deliberate indifference and causation. The

10

City therefore is entitled to judgment in its favor.

It is axiomatic that there is no vicarious liability under section 1983, and thus a municipality may not be held liable merely because one of its employees has inflicted an injury. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010), *cert. denied*, 131 S.Ct. 3030 (2011). A municipality may be liable only when its own unconstitutional or illegal policy or custom "is the moving force behind the injury alleged." *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). For this reason,

> [p]laintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. These are "action[s] for which the municipality is actually responsible."

*Connick v. Thompson*, – U.S. –, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (internal citations omitted; alteration in original). Thus, "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (citation and internal quotation marks omitted).

Given this requirement, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S.Ct. at 1359. Nevertheless, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise

to the level of an official government policy for purposes of § 1983." *Id.* To recover under this theory, it must be shown that the municipality was deliberately indifferent to the need for more or better training such that " failure to train reflects a 'deliberate' or 'conscious' choice by a municipality." *Canton*, 109 S.Ct. at 1205.

To establish this element, Mr. Bleck must show that the City "has actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately choose[] to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). *See also Brown*, 117 S.Ct. at 1391 ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."). "[A] city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick*, 131 S.Ct. at 1360 (citation and internal quotation marks omitted). For this reason, proof of deliberate indifference generally requires evidence showing a pattern of tortious conduct of which the municipality was or should have been aware. *See Brown*, 117 S.Ct. at 1390; *Barney*, 143 F.3d at 1307. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S.Ct. at 1360.

Mr. Bleck does not argue, much less attempt to establish by offer of evidence, that such a pattern of prior incidents exists here. Instead, he suggests that this case presents the exceptional circumstance in which deliberate indifference may be found

despite the absence of a pattern of prior unconstitutional behavior.  **See Barney**, 143 F.3d at 1307-08.  This class of cases, however, is exceedingly narrow, and liability will be found only where "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations."  **Id.** (citing **Brown**, 117 S.Ct. at 1391).

As a general matter, the Supreme Court has cautioned specifically against judicial micro-management in this area.  "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  **City of Canton**, 109 S.Ct. a 1206.  Thus,

> showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.  Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice.

**Connick**, 131 S.Ct. at 1363-64 (citation, internal quotation marks, and alterations omitted).  The Supreme Court has made clear that the single-incident exception is premised on officers' "utter lack of an ability to cope with constitutional situations," and thus "is concerned with the substance of the training, not the particular instructional format."  **Id.** at 1363.  It therefore is only when officers "have no knowledge at all of the constitutional limits on the use of [] force" that the exception is potentially is viable.  **Id.**

Despite these substantial barriers, Mr. Bleck suggests that this case presents

13

such an extraordinary instance because the City failed to specifically train officers in dealing with the mentally ill. In response, the City has presented evidence regarding the extensive training that both Alamosa Police Department ("APD") officers generally and Officer Martinez particularly received. This evidence demonstrates that Officer Martinez, like all officers in the State of Colorado, is required to be certified under the Police Officer Standards and Training ("POST") Act. *See* §6-2.5-102 & § 24-31-301 *et seq.*, C.R.S. POST certification in turn requires successful completion of a course of study at a basic law enforcement academy. The POST Basic Academy Training Program currently requires 68 course hours in basic legal concepts, including arrest, search, and seizure, as well as specific instruction on interacting with special populations and "risk assessment response," which covers interactions with the mentally ill. *See* **Post Manual**, Appendix C, Basic Academic Training Program §§ I.A.2. at C-1, II.A. at C-6 III.D. at C-19, & III.E. at C-20.[5] Although Officer Martinez admits that these specific requirements are somewhat different from those that pertained at the time he was certified more than 20 years ago, his education included course work and training in use of force, arrest procedures and control, search and seizure, and firearms and other weapons training. (***See* Def. Supp. Br. App.**, Exh. A-25 at 9 [#226-4].)[6]

Officers who are new to the APD participate in a field training program ("FTO") which cover issues including arrest control, use of force, search and seizure, and use of

---

[5] The POST Manual itself is available as a PDF file, a link to which is accessible from the POST Manual FAQ page, available at http://www.coloradoattorneygeneral.gov/post_faq_page_0 (last accessed May 4, 2015).

[6] Prior to attending the basic training academy, Officer Martinez received an Associates Degree in Applied Science, taking courses in criminal justice and law enforcement, covering, *inter alia*, issues of constitutional law and arrest and control techniques. (**Def. Supp. Br. App.**, Exh. A-26 at 10.)

firearms. Officer Martinez participated in a fourteen-week FTO program with the APD when he was hired initially and has since served as an FTO instructor. (*Id.* at 10-11.)[7] Thereafter, APD officers receive additional training throughout their careers.[8] Such training includes on-going firearms qualification, which includes arrest simulations and shoot/don't shoot scenarios, as well as control techniques and arrest control training. (*Id.* at 8-9 & 16.) In addition,

> throughout their career[s], officers are exposed to training and on-the-job conditions regarding interacting with the public, to include those persons with mental conditions or who are otherwise impaired by drugs and/or alcohol. Formal training is given in the Academy, and then again throughout an officer's career and usually included within use of force, arrest control and other such training.

(*Id.* at 16.)

To counter this evidence, Mr. Bleck points to deposition testimony from Officers Martinez, Lockwood, and Cooper that they received no *written* training materials from the APD addressing dealing with the mentally ill. (*See* **Plf. Motion for Leave To File Supp. to Plf. Resp (Doc. No. 47) App.** Exh. A at 188 [#129-2], Exh. B at Exh. C. at 24

---

[7] In addition, Officer Martinez taught at the Police Academy at the Trinidad State Junior College from 2006 to 2010. Among various other relevant topics, Officer Martinez taught "problem-oriented policing," which dealt with issues relating to the ADA and interacting with the mentally ill. (**Def. Supp. Br. App.**, Exh. A-26 at 12.)

[8] Although the City maintains that such training is mandatory and provided monthly (*see* **Def. Supp. Br.** at 12), the evidence to which it cites does not plainly support that assertion, but instead refers to other documents and discovery which, if included in the record at all, have not been plainly identified for the court's inspection. *See Carbajal v. City and County of Denver*, 2012 WL 592871 at * 2 (D. Colo. Feb. 23, 2012) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), *aff'd*, 502 Fed. Appx. 715 (10th Cit. Sept. 25, 2012), *cert. denied*, 134 S.Ct. 103 (2013).

[#129-4]; Exh. D at 10-11 [#129-5].)[9]  This evidence is ambiguous at best, and I find and conclude that it is insufficient as a matter of law to create a genuine dispute of material fact sufficient to permit a reasonable jury to infer that APD officers in general or Officer Martinez in particular did not receive any training on how to approach the mentally ill.

   Instead, Mr. Bleck focuses primarily on APD's General Order No. 02510 on use of force, which he criticizes for not addressing interactions between officers and the mentally ill.  (*See* **Plf. Original Resp. App.**, Exh. 5 at 13-20 [#47], filed September 15, 2011.)  His reliance on this document is inapt, however, because his claim against the City is for failure to train, not for maintenance of an unconstitutional written policy.  The General Order – a self-described set of "guidelines in the use of force and in the reporting of the use of force" (*id.* at 13) – does not itself contemplate or provide for any particular type of training.  Moreover, despite whatever gaps maybe thought to exist within the use of force policy specific to dealing with mentally ill or intoxicated persons, nothing therein counters the City's evidence that officers did in fact receive training

---

[9]  Mr. Bleck also suggests that Officer Martinez was never trained by the APD in how to approach a mentally ill person.  That assertion is based on the following testimony:

> Q: Were you ever trained in how to approach a mentally ill person?
> A: With possibly a weapon.
> Q: Were you ever trained in how to approach that person – . . . by the Alamosa Police Department?
> . . . .
> A: No.

(**Plf. Motion for Leave To File Supp. to Plf. Resp (Doc. No. 47) App.** Exh. A at 251-252 [#129-2].)  Even if this evidence constituted more than a mere scintilla as to the issue whether Officer Martinez himself received such specific training from the APD, nothing therein counters the City's evidence that such training was available within the realm of other relevant law enforcement training the APD offered.  In fact, Chief Jackson testified that, although there was no "formal outlined training" on dealing with mentally ill or intoxicated persons, the APD worked frequently with the San Luis Valley Mental Health Center and had included representatives of that organization in APD's regular training sessions at various times, such that APD officers had "talked about [the issue] many times."  (*Id.*, Exh. B at 99-100 [#129-3].)

16

sufficient to equip them to engage and deal with the mentally ill.  Nor has Mr. Bleck made any other effort to demonstrate that the training APD officers do receive is so lacking in relevant substance that a constitutional violation was the "obvious consequence" of the failure to provide more specific training.  **Brown**, 117 S.Ct. at 1391.[10]  **See also Barney**, 143 F.3d at 1308; **Kyker v. City of Oklahoma City**, 2006 WL 3333838 at *4 (W.D. Okla. Nov. 14, 2006).

More importantly, however – and regardless whether officers were trained to deal with the mentally ill *vel non* – the most salient fact remains that Officer Martinez's decision to go hands on with his duty weapon still in his hand was *directly contrary* to his training in the use of this control technique.  (**See Plf. Motion for Leave To File Supp. to Plf. Resp (Doc. No. 47) App.** Exh. A at 253-254 [#129-2], Exh. B at 210-211 [#129-3], Exh. D at 79.)  It was this action that directly and proximately caused the injuries Mr. Bleck suffered.  The City was not the "moving force" behind this injury, however, because the APD had trained its officers *not* to attempt hands on control while still armed, regardless of the mental status of the person sought to be controlled.  **See Brown**, 117 S.Ct. at 1388.

In the absence of vicarious liability, the City may not be held liable based on a single instance in which an officer acted contrary to the specific dictates of his training.  Thus, Mr. Bleck's failure to train claim ultimately fails, and the City is entitled to summary judgment.

---

[10]  This is not to say that prior training *per se* will insulate a municipality from liability for failure to train.  The training officers do receive itself may be constitutionally inadequate.  **See Hobart v. City of Stafford**, 784 F.Supp.2d 732, 754 (S.D. Tex. 2011).  Mr. Bleck simply has failed to demonstrate that such is the case here.

17

## IV.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That judgment shall enter on behalf of defendant, The City of Alamosa, Colorado, and against plaintiff, The Estate of Steven Wayne Bleck, by Joanna Churchill, Personal Representative for Steven Wayne Bleck, deceased, on plaintiff's sole remaining cause of action against the City for failure to train;

2.  That the City is awarded its costs, to be taxed by the clerk of the court in the time and manner prescribed in Fed. R. Civ. P. 54(d) and D.C.COLO.LCivR 54.1; and

3.  That this case is closed.

Dated May 12, 2015, at Denver, Colorado.

                                               **BY THE COURT:**

*/s/ Robert E. Blackburn*
Robert E. Blackburn
United States District Judge